Revised March 31, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-20014
_____


GARY GRAHAM, now known as
SHAKA SANKOFA,

                              Petitioner-Appellant,

v.

GARY JOHNSON, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

                              Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____
February 25, 1999

Before KING, Chief Judge, JOLLY and DeMOSS, Circuit Judges.

KING, Chief Judge:

Gary Graham, now known as Shaka Sankofa,[1] a Texas death row inmate, appeals the district court's dismissal of his fourth habeas corpus application under 28 U.S.C. § 2254. Alternatively, he moves for the recall of the mandate in one of his prior habeas cases or for an order pursuant to 28 U.S.C. § 2244(b)(3)(C) authorizing the district court to consider a successive habeas

_____

[1] For the sake of consistency, we refer to Graham by the name under which he was convicted and sentenced.

corpus petition.  We previously denied this last motion in an order entered February 8, 1999, in which we noted that we would rule on the other two pleadings and issue a full opinion explaining our decision in all three matters as soon as possible. We now do so.

Graham's current application for a writ of habeas corpus is successive to a previous petition he filed in 1988 that was fully litigated on the merits and, in fact, was twice considered by the Supreme Court.  In 1996, more than two years before Graham brought this application, Congress passed a new law, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), that was specifically designed to limit and, in some cases, completely bar successive applications such as Graham's.  Not only did AEDPA itself impose stringent restrictions on successive habeas applications, but the House Conference Report accompanying it explicitly stated that it incorporated "reforms to curb the abuse of the statutory writ of habeas corpus, and to address the acute problems of unnecessary delay and abuse in capital cases." Graham concedes that all of the claims he makes today could have been raised in 1988 and that if AEDPA governs his current application, he is entitled to no relief whatsoever.  Thus, our task is to determine whether AEDPA applies to him.  We conclude that it does.  Accordingly, we must affirm the judgment of the district court dismissing Graham's fourth federal habeas

application and deny his motion for recall of the mandate in his previous habeas case.

## I. FACTUAL AND PROCEDURAL HISTORY

This appeal and the accompanying alternative motions are the latest installments of a story that began nearly eighteen years ago. About 9:30 p.m. on May 13, 1981, in the parking lot of a Safeway Food Store in Houston, Texas, Bobby Lambert, a customer at the store, was shot and killed by a lone black male who apparently was trying to rob him. The perpetrator left the scene without being apprehended. After his arrest for another offense about a week later, Gary Graham, then seventeen years old, was charged with the capital murder of Lambert.

At trial in the 182nd Judicial District of Harris County, Texas, Bernadine Skillern was the only witness to identify Graham as Lambert's killer; two other eyewitnesses, Wilma Amos and Daniel Grady, were unable to do so because they did not get a good enough look at, or did not sufficiently recall, the perpetrator's face. Immediately before Skillern testified that Graham was the shooter, the trial judge conducted a hearing outside the presence of the jury to determine whether her identification was "tainted by [an] illegal lineup." Gilbert v. California, 388 U.S. 263, 272 (1967) (citing United States v.

3

Wade, 388 U.S. 218, 240 (1967)).  Skillern described in some detail how she had picked Graham out of a May 26, 1981 photographic display and a May 27, 1981 police station lineup, and defense counsel raised many of the same issues regarding suggestive identification procedures that Graham's current counsel now brings before us.  The trial judge concluded that Skillern's identification was "based solely on [Skillern's] independent recollection of the facts as they occurred on May 13, 1981" and was "made independently of any conversation or processes that were performed by members of the Houston Police Department."  The jury then returned, and Skillern testified in open court that Graham was the person she had seen shoot Lambert.  Defense counsel presented no evidence at the guilt-innocence stage.  The jury convicted Graham of capital murder and answered the three death penalty special issues[2] in the affirmative.[3]

---

[2] The jury was asked the following questions:

> (1) Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

> (2) Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

> (3) Do you find from the evidence beyond a reasonable doubt whether [sic] the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased?

Accordingly, the court sentenced Graham to death. On direct appeal, the Texas Court of Criminal Appeals affirmed Graham's capital murder conviction and death sentence in an unpublished opinion. See Graham v. State, No. 68,916 (Tex. Crim. App. June 12, 1984). Graham did not seek certiorari from the United States Supreme Court.

Instead, represented by new counsel, Graham filed a state habeas petition in July 1987, contending, inter alia, that he was incompetent and therefore could not constitutionally be executed, that the Texas capital punishment scheme was constitutionally defective for various reasons and did not allow the jury adequately to consider mitigating evidence, including youth, and that he received ineffective assistance of counsel. Counsel was alleged to be ineffective in numerous respects, including failing

---

The jury answered yes to all three questions. After the verdict was read, the defense requested that the jury be polled, and each juror acknowledged that the verdict accurately represented his or her answers to the special issues.

[3] During the punishment phase, the state demonstrated that from May 14 to May 20, 1981, Graham robbed some thirteen different victims in nine different locations, in each instance leveling either a pistol or a sawed-off shotgun at the victim. Two of the victims were pistol-whipped, one was also shot in the neck, an elderly man was struck with the vehicle Graham had stolen from him, and a fifty-seven-year-old woman was kidnapped and raped. There was also testimony that Graham had a poor reputation in the community for being a peaceful and law-abiding citizen. The defense presented only the testimony of Graham's stepfather and grandmother as to his good and nonviolent character. After the capital murder conviction, Graham pleaded guilty to, and was sentenced to twenty-year concurrent prison terms for, ten aggravated robberies committed on May 14, 15, 16, 18, 19, and 20, 1981.

adequately to investigate, interview, and call alibi witnesses and not allowing Graham to testify. Graham's petition was supported by an affidavit signed by Dorothy Shields, William Chambers, Mary Brown, and Loraine Johnson[4] asserting that Graham had been with them continuously during the night of the offense, that Graham had told them that he had given their names to his trial counsel, that counsel did not call them to testify, and that Graham later informed them that counsel not only had refused to call alibi witnesses but also had prevented him from testifying on his own behalf. State district judge Donald Shipley, who had not presided at Graham's trial, held competency and evidentiary hearings. At the latter, Graham, three alibi witnesses (William Chambers, Mary Brown, and Dinah Miller), and Graham's trial counsel (Ronald Mock and Chester Thornton), testified. On February 9, 1988, Judge Shipley entered findings of fact and conclusions of law adverse in all respects to Graham. With respect to the ineffective assistance of counsel claim, he found:

4.    Prior to trial, counsel [who had been appointed to represent Graham on June 12, 1981] reviewed the information in the State's file several times.

5.    On numerous occasions prior to trial, counsel met with the applicant and attempted to discuss the facts of the case with him. The applicant stated only that he did

---

[4]  Brown is Graham's wife. Chambers and Johnson are his cousins. Shields is a friend who lived near Graham's paternal grandmother, with whom Graham sometimes resided, at the time of the offense.

not commit the robbery-murder and that he had spent the evening with a girlfriend whose name, appearance, and address the applicant could not remember.

6. Although defense counsel made numerous inquiries of applicant, he did not give his defense counsel where he had been and what he had been doing on the night of the instant offense, May 13, 1981.

7. No person ever presented himself to defense counsel as an alibi witness, either before, during or after trial.

8. Specifically, the applicant did not furnish his counsel with the names or addresses of Dorothy Shield [sic], William Chambers, Mary Brown, or Lorain [sic] Johnson as potential alibi witnesses.

9. This court finds that the testimony of William Chambers, Mary Brown, and Dinah Miller concerning Gary Graham's whereabouts on May 13, 1981 is not credible testimony.

10. Gary Graham was aware that an investigator was working with defense counsel in connection with the defense of his case.

11. Counsel for applicant hired an investigator, Merv West, who assisted them in investigating and interviewing possible defense witnesses.

Ex parte Graham, No. 335378-A (182d Dist. Ct., Harris County, Tex. Feb. 9, 1988). The state habeas trial court concluded that Graham had received effective assistance of counsel and recommended that the Texas Court of Criminal Appeals deny habeas relief. The Court of Criminal Appeals did so in an unpublished per curiam order with reasons issued February 19, 1988.

Shortly thereafter, Graham, through new counsel, filed a federal habeas application in the Southern District of Texas. In addition to challenging the racial and age composition of the grand jury that indicted him, the constitutionality of the Texas

7

death penalty statute as applied to him, and his own competency to be executed, Graham asserted that he was denied the effective assistance of trial counsel. Specifically, he claimed that counsel failed adequately to investigate his case and introduce defense witnesses at trial. Although he told them of at least four alibi witnesses, Graham asserted, counsel neither interviewed nor called these individuals to testify. Graham also complained that counsel refused to permit him to testify, failed to obtain an independent psychiatric evaluation, did not object to the exclusion of certain jurors, allowed him to be tried in the same clothes he was wearing when arrested, concealed counsel Ronald Mock's personal acquaintance with chief prosecution witness Skillern, neglected adequately to investigate the extraneous offenses introduced against him at the punishment phase of his trial, and called only two punishment phase witnesses on his behalf. Without holding an evidentiary hearing, the district court denied relief, see Graham v. Lynaugh, No. 88-563 (S.D. Tex. Feb. 24, 1988), and the Fifth Circuit declined to issue a certificate of probable cause, see Graham v. Lynaugh, 854 F.2d 715, 723 (5th Cir. 1988). The court of appeals panel specifically reviewed the ineffective assistance of counsel allegations and the state habeas court findings in respect thereto, concluding that "Graham has failed to overcome the presumption that the state court's findings were correct." Id. at 722.

8

In a per curiam order, the Supreme Court granted certiorari, vacated the Fifth Circuit's judgment, and remanded "for further consideration in light of Penry v. Lynaugh[, 492 U.S. 302 (1989)]." Graham v. Lynaugh, 492 U.S. 915 (1989). On remand, the same Fifth Circuit panel reinstated, in Part I of its new opinion, all of its 1988 opinion except Section II.B, which dealt with whether the Texas capital sentencing scheme allowed adequate consideration of mitigating evidence, especially youth. See Graham v. Collins, 896 F.2d 893, 894 (5th Cir. 1990). The panel went on to hold that the Texas capital sentencing scheme, contrary to Penry, did not allow adequate consideration of Graham's youth and accordingly vacated his death sentence. See id. at 898. The Fifth Circuit then took the case en banc and ultimately affirmed the denial of habeas relief. See Graham v. Collins, 950 F.2d 1009, 1034 (5th Cir. 1992). The en banc court explicitly approved Part I of the 1990 panel opinion, thus reinstating all of the 1988 panel opinion except Section II.B thereof, including the earlier panel findings that Graham's ineffective assistance of counsel claim lacked merit. See id. at 1013 n.4. It reversed the 1990 panel's conclusion that the Texas capital sentencing scheme did not allow adequate consideration of Graham's mitigating evidence, particularly his youth. See id. at 1030-34. The Supreme Court affirmed, addressing only the youth-Penry issue and holding that any claim that the Texas capital sentencing scheme did not allow adequate consideration of youth

was barred under Teague v. Lane, 489 U.S. 288 (1989).  See Graham v. Collins, 506 U.S. 461, 477-78 (1993).

On April 20, 1993, Graham, through counsel, filed his second state habeas petition.  Again, he urged that trial counsel was ineffective for failing to develop or present defense evidence or meaningfully test the prosecution's evidence, and that he thus had been "condemned to die for a crime that he almost certainly did not commit."  Graham also asserted that the trial court's voir dire erroneously equated "deliberateness," as used in the first death penalty special issue, with "intent" as relevant to guilt or innocence.  Finally, he contended that the special issues did not allow adequate consideration of his youth.[5]  The ineffective assistance claim was supported by new evidence purporting to prove that a number of eyewitnesses whom Graham's counsel had not called during trial would have provided testimony tending to exonerate Graham.  This new evidence consisted of the following:

1.  A March 31, 1993 affidavit of the investigator, Mervyn West, retained by Graham's trial counsel, indicating that he and counsel had assumed Graham was guilty and therefore gave his case relatively little attention;

---

[5]  The apparent basis for making this argument, despite the Supreme Court's decision in Graham v. Collins, 506 U.S. 461 (1993), was the theory that Graham, by its reliance on Teague v. Lane, 489 U.S. 288 (1989), did not apply except in federal habeas actions.  On February 19, 1993, the Supreme Court had granted certiorari in the direct appeal case of Johnson v. Texas, 506 U.S. 1090 (1993), raising the youth-Penry issue.

10

2.   April 17, 1993 affidavits of Malcolm Stephens and his wife, Lorna Stephens, stating that they had come on the crime scene just after the shooting and had seen a young black man run away (not followed in the parking lot by anyone in a car, as Skillern had testified that she had done), and that the man was about 5'5" tall (a lineup chart showed Graham to be 5'9");

3.   An April 15, 1993 affidavit of Wilma Amos, who had been present at the crime scene, stating that the shooter was no taller than 5'5", that no one followed him in a car, that defense counsel never contacted her, and that she had examined two photographs of Graham as he appeared in 1981 and was "certain that Gary Graham is not the man who shot Bobby Lambert";

4.   An April 15, 1993 affidavit of Ronald Hubbard, a Safeway employee who also had been present at the scene, describing the shooter as 5'6" and indicating that no one associated with Graham's defense team ever contacted him;

5.   An April 18, 1993 affidavit of Mary Brown indicating that she had been with Graham on the night of the offense;

6.   An April 18, 1993 affidavit of William Chambers indicating that he had been with Graham on the night of the offense;

7.   An April 18, 1993 affidavit of Dorothy Shields indicating that she had been with Graham for most of the night of the offense; and

8.   An April 18, 1993 affidavit of Loraine Johnson indicating that she had been with Graham on the night of the offense and that she had spoken to trial counsel about testifying to an alibi defense but had been rebuffed.

Graham supplemented his petition on April 26, 1993, adding a claim under Herrera v. Collins, 506 U.S. 390 (1993), that because he was actually innocent his execution would be unconstitutional. This supplement was supported by an April 26, 1993 affidavit of Malcolm Stephens stating that, after seeing news coverage of

11

Graham's case, he had realized that Graham was not the person who had run in front of his car in the Safeway parking lot and stating that he saw the true murderer several times in 1982, 1983, and 1985. The state filed a reply, supported by an April 21, 1993 affidavit from trial counsel Ronald Mock, an April 22, 1993 affidavit from Mervyn West, and a March 26, 1993 affidavit from Bernadine Skillern. Later that same day, the state habeas trial court, Judge Shipley, without holding an evidentiary hearing, entered findings and conclusions, plus supplemental findings, recommending that the Court of Criminal Appeals deny relief. The trial court adopted its February 9, 1988 findings and conclusions regarding Graham's first state habeas petition. In addition, it found that the new 1993 affidavits from Chambers, Brown, Shields, and Loraine Johnson were "not credible," that in light of his April 22, 1993 affidavit showing loss of memory, West's March 31, 1993 affidavit was "not reliable," that Amos's 1993 affidavit was "not credible," that Hubbard and the Stephenses did not see the actual shooting and that their affidavits therefore did not undermine Skillern's identification, and that Skillern's testimony was credible. The court concluded that Graham's ineffective assistance of counsel claim had been rejected in the previous state habeas proceeding and hence need not be considered again. Alternatively, it found that Graham had shown neither defective performance nor any resultant prejudice. Finally, the court concluded that a claim of actual innocence

12

independent of constitutional infirmity at trial was not cognizable in habeas proceedings and that even if it were, Graham fell far short of the showing necessary to trigger consideration of such a claim.  On April 27, 1993, in a per curiam order, the Court of Criminal Appeals denied habeas relief.  See Ex parte Graham, 853 S.W.2d 564 (Tex. Crim. App. 1993).  Graham filed both a petition for certiorari in the Supreme Court, which was denied, see Graham v. Texas, 508 U.S. 945 (1993), and a motion for reconsideration, which the Court of Criminal Appeals overruled, see Ex parte Graham, 853 S.W.2d 565, 566 (Tex. Crim. App. 1993).  Nevertheless, the latter ordered Graham's execution stayed for thirty days pending the Supreme Court's resolution of Johnson v. Texas, 506 U.S. 1090 (1993) (granting certiorari).  See Graham, 853 S.W.2d at 566-67.

On April 28, 1993, immediately after the Texas Court of Criminal Appeals denied relief on his second state habeas petition, Graham filed a second federal habeas application in the Southern District of Texas asserting that he had received ineffective assistance of counsel at trial.  He voluntarily dismissed it that same day, after Governor Ann Richards granted a thirty-day stay in connection with executive clemency proceedings.

On June 24, 1993, the Supreme Court issued its opinion in Johnson v. Texas, 509 U.S. 350 (1993), holding that the Texas capital sentencing scheme adequately allowed consideration of the

defendant's youth as a mitigating factor. See id. at 353. Graham then filed in the Court of Criminal Appeals a motion to continue the stay of execution and for remand to the state trial court for an evidentiary hearing on his claims of ineffective assistance of counsel, based on evidence discovered after the second state habeas proceeding. In a per curiam order issued July 5, 1993, the Court of Criminal Appeals denied the motion to continue the stay and the motion for remand without prejudice. The state then set Graham's execution for August 17, 1993.

On July 21, 1993, Graham filed a civil suit against the Texas Board of Pardons and Paroles (TBPP) seeking an evidentiary hearing before that body on his innocence-based clemency request. After a hearing, the Travis County state district court issued a temporary injunction requiring the TBPP to hold a hearing on Graham's claim of innocence by August 10, 1993 or, in lieu thereof, to reschedule his execution until after such a hearing. The TBPP did not hold a hearing, but instead filed a notice of appeal to the state court of appeals in Austin, which operated to supersede the trial court's order. On August 13, 1993, the Austin Court of Appeals, on Graham's motion, enjoined his execution pending resolution of the TBPP's appeal. Three days later, the Court of Criminal Appeals, on Graham's motion, stayed his execution "pending further orders by the Court." On the same day, the Court of Criminal Appeals also denied motions, filed by the district attorney of Harris County and the TBPP, for leave to

14

file with the Court of Criminal Appeals applications for mandamus to require the Austin Court of Appeals to vacate its injunction prohibiting Graham's execution. See State ex rel. Holmes v. Third Court of Appeals, 860 S.W.2d 873, 873 (Tex. Crim. App. 1993). On November 9, 1993, however, the court sua sponte reconsidered its denial of leave to file the applications for mandamus, granted leave, and stayed further proceedings in the Austin Court of Appeals. See State ex rel. Holmes v. Honorable Court of Appeals, 885 S.W.2d 386, 386-87 (Tex. Crim. App. 1993). Graham, through counsel, then appeared before the Court of Criminal Appeals as the real party in interest. On April 20, 1994, after Graham's appeal of his third federal habeas application had been briefed and argued, see infra, the court conditionally granted the writs, holding that the Austin Court of Appeals had no jurisdiction to enjoin Graham's execution. See State ex rel. Holmes v. Honorable Court of Appeals, 885 S.W.2d 389, 390 (Tex. Crim. App. 1994). It also addressed the scope of Graham's available state habeas remedies with respect to his claim that evidence discovered since his conviction demonstrated his actual innocence and decided that habeas corpus is an appropriate vehicle for a prisoner to assert claims of actual innocence:

> [W]e hold an applicant seeking habeas relief based on a
> claim of factual innocence must, as a threshold, demonstrate
> that the newly discovered evidence, if true, creates a doubt
> as to the efficacy of the verdict sufficient to undermine
> confidence in the verdict and that it is probable that the

15

verdict would be different. Once that threshold has been met the habeas court must afford the applicant a forum and opportunity to present his evidence.

. . . .

This threshold standard and burden of proof will satisfy the Due Process Clause of the Fourteenth Amendment and we adopt them in the habeas context. If the applicant meets the threshold standard announced above the habeas judge must hold a hearing to determine whether the newly discovered evidence, when considered in light of the entire record before the jury that convicted him, shows that no rational trier of fact could find proof of guilt beyond a reasonable doubt.

Therefore, we . . . hold that, pursuant to Tex.Code Crim.Proc.Ann. art. 11.07, Graham may appropriately couch his claims of factual innocence in the context of a violation of the Due Process Clause of the Fourteenth Amendment.

Id. at 398-99. Notwithstanding this conclusion, the court declined to use the case then before it to resolve Graham's claim because "there is no [habeas] application presently pending before this Court, nor has the trial judge been given the opportunity to prepare findings of fact consistent with art. 11.07 § 3." Id. at 399. It observed, however, that "Graham is free to pursue his claims through the filing of an application under Tex.Code Crim.Proc.Ann. art. 11.07." Id.

On June 22, 1994, the Austin Court of Appeals set aside the Travis County district court's temporary injunction against the TBPP, but did not rule on the merits of the controversy. In October, the Travis County district court rendered judgment that Graham was not entitled to a clemency hearing before the TBPP on his actual innocence claim. The Austin Court of Appeals affirmed:

16

> [W]e determine that Graham's right to a due course of law
> hearing on his claim of actual innocence has been satisfied
> by the habeas corpus procedure fashioned for him by the
> Court of Criminal Appeals in Holmes.  Upon a showing of new
> evidence that undermines confidence in the jury verdict,
> Graham will be entitled to an evidentiary hearing in
> accordance with statutory post-conviction habeas corpus
> procedures. . . .
>      . . . Now that the Court of Criminal Appeals in Holmes
> has created a judicial vehicle for testing such a claim of
> actual innocence, we hold that the Texas Constitution does
> not afford Graham an additional, duplicative hearing within
> the executive-clemency process.

Graham v. Texas Bd. of Pardons & Paroles, 913 S.W.2d 745, 751

(Tex. App.--Austin 1996, writ dism'd w.o.j.).  Graham was thus

left with recourse only to the courts.

The day after filing the civil suit against the TBPP,

Graham, through counsel, filed a third federal habeas application

in the Southern District of Texas.  The application asserted only

two grounds for relief:  first, that Graham was actually innocent

of the offense and thus was entitled to relief under the opinions

of five justices in Herrera v. Collins, 506 U.S. 390 (1993),

agreeing that "the execution of an innocent person would violate

the Constitution," and second, that he was denied effective

assistance of counsel in that his attorneys failed to interview

crime scene witnesses named in the police report, investigate and

present an alibi defense, properly question witness Amos, and

call Hubbard to the stand.  Graham also moved for an evidentiary

hearing and for leave to undertake discovery.

Graham's application was supported by numerous affidavits

and exhibits, many of which he had obtained after the conclusion

17

of his second state habeas proceeding on April 26, 1993 and never had submitted to the state courts. This new material included the following:

1. A July 10, 1993 affidavit of Sherian Etuk, who had been working at the Safeway on the evening of May 13, 1981 and had seen the shooting or its immediate aftermath, describing the perpetrator as a young black man not taller than 5'6", with a light build and very narrow face, declaring that Etuk had been shown photographs by the police and that no one had contacted her on behalf of Graham, and stating that none of four pictures of Graham "depict the guy who shot the man out in the parking lot that night";

2. A May 25, 1993 affidavit of crime scene witness Leodis Wilkerson, aged twelve in May 1981, declaring that he was never contacted by anyone on Graham's behalf, describing the shooter as a short, young, clean-shaven black man, and stating that none of three attached photographs of Graham "to the best of my memory looks anything like the man who did the shooting at the Safeway";

3. A June 1, 1993 affidavit of Loraine Johnson providing essentially the same information as her April 18, 1993 affidavit but describing in more detail her attempt to inform Graham's trial counsel of his alibi;

4. A May 1993 affidavit of Vanessa Ford tending to corroborate the alibi portions of Loraine Johnson's June 1, 1993 affidavit;

5. A June 28, 1993 affidavit of Jo Carolyn Johnson corroborating Loraine Johnson's affidavits as to Loraine's informing Graham's trial counsel of Graham's alibi;

6. A Houston Police Department offense report indicating that Lambert was facing federal drug charges in Oklahoma, was carrying three shotguns and a number of false identification cards in his van, and had "fashioned himself as a con man," describing three other suspects in the Lambert murder, who were not investigated further after Graham's arrest, and indicating that there was no evidence except Skillern's

18

identification connecting Graham to the crime, the Safeway, or its neighborhood;

7.   A July 1993 report by psychologist Elizabeth Loftus concluding that Skillern's identification was likely unreliable;

8.   An April 20, 1993 report by another psychologist, Curtis Wills, asserting that "Bernadine Skillern's identification is totally unreliable";

9.   A Houston Police Department firearms report dated May 26, 1981, indicating that the .22 caliber pistol Graham had with him when arrested was not the .22 caliber pistol with which Lambert was killed.

On August 6, 1993, the state filed its answer and motion for summary judgment, which waived exhaustion and did not raise the issue of successive or abusive applications.  On August 13, 1993, the district court, without any evidentiary hearing, denied Graham's application.  See Graham v. Collins, 829 F. Supp. 204, 209-10 (S.D. Tex. 1993).

On appeal, the Fifth Circuit declined to accept the state's waiver of exhaustion and remanded the case to the district court. See Graham v. Johnson, 94 F.3d 958, 970-71 (5th Cir. 1996).  In so doing, it concluded that exhaustion would not be futile, although Texas recently had passed a statute erecting significant barriers to death row inmates' successive habeas applications:[6]

_____

[6]   Before the passage of the 1995 act, the Texas abuse-of-the-writ doctrine allowed the courts, after finding that a habeas petitioner had failed without cause to address the same issue on direct appeal or in a previous petition, to refuse to accept the habeas petition.  See Ex parte Dora, 548 S.W.2d 392, 393-94 (Tex. Crim. App. 1977).  The rule was not regularly applied, however, see Lowe v. Scott, 48 F.3d 873, 876 (5th Cir. 1995), until 1994, see Ex parte Barber, 879 S.W.2d 889, 891 n.1 (Tex. Crim. App.

19

(a) If an initial application for a writ of habeas corpus is untimely or if a subsequent application is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent or untimely initial application unless the application contains sufficient specific facts establishing that:

(1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable:

(A) on the date the applicant filed the previous application; or

(B) if the applicant did not file an initial application, on or before the last date for the timely filing of an initial application;

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071 or 37.0711.

Tex. Code Crim. Proc. Ann. art. 11.071 § 5(a).  Section 5(e) defines an unavailable factual claim as one "not ascertainable through the exercise of reasonable diligence on or before that date."  The Fifth Circuit found that these new provisions "appear[ed]" to afford Graham the right to have his claims heard, and noted that, in any case, it was unclear whether article

1994) (announcing strict application of abuse-of-the-writ doctrine).

20

11.071, enacted while Graham's federal habeas appeal was pending, would apply to him.  See Graham, 94 F.3d at 969 n.20.  The court also emphasized that exhaustion was necessary to flesh out the record:

> The issues in this case are almost exclusively factual, and the relevant factual scenario is complex, highly controverted, and in many respects unresolved.  The district court denied the petition without an evidentiary hearing.  There is a large body of relevant evidence that has not been presented to the state court.  It is doubtful that the record before us allows review of the underlying issues on a fully informed basis.

Id. at 970-71.

On remand, on October 11, 1996, the district court dismissed Graham's third federal habeas application for failure to exhaust state remedies.  Eighteen months later, on April 27, 1998, Graham filed a third state habeas application, supported by the evidence he previously had presented to the courts and three entirely new affidavits, raising the same two issues as the third federal habeas application.  He also added a claim that Texas violated his Eighth and Fourteenth Amendment rights by (1) sentencing him to death for a crime he allegedly committed at the age of seventeen without a pretrial determination that he was sufficiently mature and morally responsible to be tried as an adult and (2) failing to require the full consideration of youth as a mitigating circumstance.  On November 18, 1998, the Court of Criminal Appeals dismissed his application as an abuse of the

21

writ under the new state habeas law.  See Ex parte Graham, No. 17,568-05 (Tex. Crim. App. Nov. 18, 1998).

On December 18, 1998, Graham filed his fourth federal habeas application in the Southern District of Texas, raising the same three issues as he had in his third state habeas application. The district court dismissed for lack of jurisdiction, holding that the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996), required Graham to obtain permission from the appropriate court of appeals before filing a "second" or "successive" habeas application.  See Graham v. Johnson, No. H-98-4241 (S.D. Tex. Jan. 7, 1999).  Graham filed motions in the district court for a stay of execution and for a certificate of probable cause or a certificate of appealability. The court granted a certificate of appealability but denied the stay.  See Graham v. Johnson, No. H-98-4241 (S.D. Tex. Jan. 8, 1999).  Graham then filed in the Fifth Circuit a motion for stay of execution, a notice of appeal from the district court's dismissal of his application, and alternative motions to recall the mandate in the 1996 habeas case or for an order authorizing the district court to consider a successive habeas corpus application.  On January 10, 1999, we granted a stay to allow more time to consider the issues presented by the three pleadings, and on February 8, 1999, in keeping with Congress's directive that we rule on such a request within thirty days, see

22

28 U.S.C. § 2244(b)(3)(D), we denied Graham's Motion for Order Authorizing District Court to Consider Successive Habeas Petition. We now rule on Graham's appeal and Motion to Recall Mandate in Previous Habeas Case and provide a full opinion explaining our decision in all three matters.

## II.  STANDARD OF REVIEW

The only issue raised by Graham's appeal, whether AEDPA applies to his current habeas application, is an issue of law that we review de novo. See Kiser v. Johnson, 163 F.3d 326, 326-27 (5th Cir. 1999). The two alternative pleadings are properly directed to us, rather than to the district court, in the first instance: The Motion to Recall Mandate in Previous Habeas Case asks us to withdraw our own prior decision, see Calderon v. Thompson, 118 S. Ct. 1489, 1498 (1998) ("[T]he courts of appeals are recognized to have an inherent power to recall their mandates, subject to review for an abuse of discretion."), and the Motion for Order Authorizing District Court to Consider Successive Habeas Petition must be filed in the appropriate court of appeals, see 28 U.S.C. § 2244(b)(3)(A).

## III.  DISCUSSION

### A.  Appeal of Dismissal

Enacted on April 24, 1996, AEDPA made it significantly harder for prisoners filing second or successive federal habeas

23

applications under 28 U.S.C. § 2254 to obtain hearings on the merits of their claims.  As amended by AEDPA, 28 U.S.C. § 2244(b) provides:

(b)(1) A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.

(2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless--

(A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

(3)(A) Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.

(B) A motion in the court of appeals for an order authorizing the district court to consider a second or successive application shall be determined by a three-judge panel of the court of appeals.

(C) The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection.

(D) The court of appeals shall grant or deny the authorization to file a second or successive application not later than 30 days after the filing of the motion.

(E) The grant or denial of an authorization by a court of appeals to file a second or successive application shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari.

(4) A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section.

28 U.S.C. § 2244(b). AEDPA also added a stringent statute of limitations to the federal habeas statute:

(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

AEDPA's amendments to the federal habeas statute impact Graham in the following manner. With respect to § 2244(b), Graham concedes in his brief on appeal that his November 1998 application is second or successive to his 1988 application, which was fully adjudicated on the merits.[7] Thus, if AEDPA applies to this latest application, he would be required to obtain an order from this court authorizing the district court to consider it. Graham admits that he cannot meet § 2244(b)'s prerequisites for the issuance of such an order. He contends, however, that he need not obtain authorization from this court because AEDPA does not apply to his November 1998 application. This is the crucial issue before us.

**1. Is the district court's dismissal of Graham's application appealable?**

Before deciding whether AEDPA does, in fact, apply to Graham's application, we pause to consider whether the district

---

[7] We are aware that the Supreme Court recently granted certiorari on the following question: "If a person's petition for habeas corpus under 28 U.S.C. § 2254 is dismissed for failure to exhaust state remedies and he subsequently exhausts his state remedies and refiles the § 2254 petition, are claims included within that petition that were not included within his initial § 2254 filing 'second or successive' habeas applications?" Slack v. McDaniel, No. 98-6322, 1999 WL 80303 (U.S. Feb. 22, 1999) (granting certiorari). Under current law, however, it is clear that an application filed after a previous application was fully adjudicated on the merits is a second or successive application within the meaning of 28 U.S.C. § 2244(b), even if it contains claims never before raised. See Felker v. Turpin, 518 U.S. 651, 655-58, 662-63 (1996). Graham's current application is therefore unquestionably second or successive.

court's order dismissing his application for lack of jurisdiction as a result of his failure to comply with 28 U.S.C. § 2244(b)(3)(C) is appealable. Although neither party has suggested that it is not, we may determine the existence of our own jurisdiction sua sponte. See Thompson v. Betts, 754 F.2d 1243, 1245 (5th Cir. 1985).

As a general rule, federal law limits our appellate jurisdiction to reviewing final decisions of the district courts. See 28 U.S.C. § 1291. Similarly, the federal habeas corpus statute provides that "[i]n a habeas corpus proceeding . . . before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held." Id. § 2253. A final judgment is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Coopers & Lybrand v. Livesay, 437 U.S. 463, 467 (1978) (quoting Catlin v. United States, 324 U.S. 229, 233 (1945)) (internal quotation marks omitted). We have taken a practical approach to determining whether a district court decision meets this standard; a judgment reflecting an intent to dispose of all issues before the court is final. See National Ass'n of Gov't Employees v. City Pub. Serv. Bd., 40 F.3d 698, 705 (5th Cir. 1994); Vaughn v. Mobil Oil Exploration & Producing Southeast, Inc., 891 F.2d 1195, 1197 (5th Cir. 1990).

Our own court and one of our sister circuits have found dismissals for failure to move for authorization to file a successive application to be appealable final orders. In Spotville v. Cain, 149 F.3d 374, 375 (5th Cir. 1998), we reviewed such a dismissal without questioning the existence of jurisdiction. The First Circuit considered an analogous situation in Pratt v. United States, 129 F.3d 54, 57-58 (1st Cir. 1997), cert. denied, 118 S. Ct. 1807 (1998), and concluded that it had jurisdiction to consider an appeal from a dismissal of a federal prisoner's successive 28 U.S.C. § 2255 motion for failure to obtain the required clearance from the court of appeals.[8] Pratt, like Graham, challenged the dismissal on the grounds that AEDPA did not apply to his successive motion. See id. at 57. Under such circumstances, the court determined, he could regain access to the district court and vindicate his theory that AEDPA

_____

[8] AEDPA added the following language to § 2255, which authorizes federal prisoners to seek relief from custody by filing a motion to vacate, set aside, or correct sentence:

A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain--
(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or
(2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255.

28

did not apply to him only by an appeal and a subsequent holding that the district court erred in considering his latest petition under the new statute. See id. The district court's order was therefore final "in the relevant sense" and appealable even though it was without prejudice to Pratt's refiling after obtaining the necessary authorization from the court of appeals. Id. at 57-58. We find this reasoning persuasive and conclude that we have jurisdiction to review the district court's dismissal of Graham's application.

## 2. Does AEDPA apply by its terms?

We now turn to the merits of Graham's appeal. It appears to us that, on its face, AEDPA applies to Graham's application. The statute was enacted on April 24, 1996, and Graham did not file his current federal habeas application until November 18, 1998. In Lindh v. Murphy, 521 U.S. 320, 336 (1997), the Supreme Court held that "the new provisions of chapter 153 [the chapter of Title 28 of the United States Code containing § 2244 and §§ 2253-2255] generally apply only to cases filed after the Act became effective." We are comforted in our conclusion by the fact that, in Felker v. Turpin, 518 U.S. 651, 655-58, 665 (1996), the Court applied AEDPA to a successive application filed after April 24, 1996 where the first application was filed before that date. It seems equally apparent that § 2244(b)'s restrictions on second or successive habeas applications govern Graham's current

29

application, which he concedes is second or successive within the meaning of the statute.

Graham, however, contends that AEDPA does not govern his most recent federal habeas application. First, he argues that it is not a new application but a continuation of his third application for federal habeas relief, which he filed in July 1993 and which was dismissed without prejudice in October 1996 for failure to exhaust state remedies.[9] Because this earlier application was pending on appeal on the date of AEDPA's enactment, he claims, the statute does not apply to it under Lindh. In the alternative, he asserts that there is no indication that Congress intended AEDPA to govern applications in the procedural posture of his own--specifically, where one or more habeas applications were filed before the enactment of the statute and a successive application was filed afterward--and to apply the Act to him would be impermissibly retroactive. We address each of these arguments in turn.

_____

[9] We point out that Graham's third claim--that he was unconstitutionally tried as an adult and that the Texas death penalty statute in effect at the time of his trial did not permit adequate consideration of youth as a mitigating factor--was not raised in his third federal habeas application and cannot properly be considered a continuation of that application. Otherwise, a prisoner whose habeas application, pending on the date of AEDPA's enactment, was later dismissed without prejudice could present any number of new claims in a later application without subjecting them to AEDPA's restrictions. But even if the pre- and post-AEDPA applications raise identical claims, the latter cannot, as we demonstrate infra, be considered a continuation of the former for purposes of determining whether the statute applies.

### 3. Is Graham's application exempt from AEDPA because it is a continuation of an application pending on the date of AEDPA's enactment?

Graham's first argument goes thus: AEDPA does not apply to habeas applications pending on the date of its enactment. See Lindh, 521 U.S. at 336. A habeas application filed after a previous application was dismissed for non-exhaustion is a "continuation" of the earlier application. In re Gasery, 116 F.3d 1051, 1052 (5th Cir. 1997) (per curiam). Therefore, AEDPA does not apply to his November 1998 application because, in the words of Gasery, it is a "continuation" of its 1993 predecessor, which was pending on appeal on the day AEDPA became law.

We think that Graham reads too much into Gasery. Our decision in Gasery does not exempt from AEDPA an application in the same procedural posture as Graham's. Instead, it holds that an application refiled after an earlier application was dismissed without prejudice for failure to exhaust state remedies is not second or successive to that earlier application within the meaning of § 2244(b) as amended by AEDPA. See id. at 1052. In doing so, however, it assumes that AEDPA governs the refiled application.[10]

---

[10] Gasery was decided before Lindh, at a time when the law in this circuit was that AEDPA applied to applications pending on the date of its enactment. See Drinkard v. Johnson, 97 F.3d 751, 766 (5th Cir. 1996). Thus, even if Gasery's first application had been, like Graham's, pending on the day that AEDPA became law, we would have assumed that the Act governed the later application. As we discuss infra, however, the Supreme Court, in

Moreover, the Supreme Court's only pronouncement on the relationship under AEDPA of applications refiled after their predecessors have been dismissed without prejudice provides little support for Graham's reading of Gasery.  In Stewart v. Martinez-Villareal, 118 S. Ct. 1618 (1998), the habeas applicant was convicted in Arizona state court of two counts of first-degree murder and sentenced to death.  See id. at 1619.  He filed three federal habeas applications, all of which were dismissed on the ground that they contained claims on which state remedies had not yet been exhausted.  See id. at 1620.  In March 1993, Martinez-Villareal filed a fourth federal habeas application asserting, inter alia, that he was incompetent to be executed under Ford v. Wainwright, 477 U.S. 399, 409-10 (1986).  The district court dismissed the Ford claim as premature.  Thereafter, the state obtained a warrant for Martinez-Villareal's

_____

a post-Lindh case, has applied AEDPA to a habeas application in the same procedural posture as Gasery's.  See Stewart v. Martinez-Villareal, 118 S. Ct. 1618, 1620-22 (1998).  Two post-Lindh cases from other circuits have applied AEDPA in the same way.  See Carlson v. Pitcher, 137 F.3d 416, 419 (6th Cir. 1998); McWilliams v. Colorado, 121 F.3d 573, 575 (10th Cir. 1997).  Furthermore, our own citations to Gasery understand it as standing for the proposition that an application filed after a predecessor is dismissed for failure to exhaust state remedies is not successive to that earlier petition and not as holding that the two are in fact the same petition.  See Alexander v. Johnson, 163 F.3d 906, 909 (5th Cir. 1998); In re Cain, 137 F.3d 234, 236 (5th Cir. 1998).  Tellingly, two circuits have held that applications in the same procedural posture as Graham's do not relate back to their predecessors for the purposes of determining whether the petitioner was in custody at the time of filing.  See Henry v. Lungren, 164 F.3d 1240, 1241-42 (9th Cir. 1999); Tinder v. Paula, 725 F.2d 801, 805-06 (1st Cir. 1984).

32

execution, and the Arizona courts found him competent to be executed. Martinez-Villareal then moved in federal district court to reopen his Ford claim, and the district court ruled that under § 2244(b), it did not have jurisdiction over a "second or successive" habeas application unless (as Martinez-Villareal had not) the prisoner obtained permission to file such an application from the appropriate court of appeals. The Ninth Circuit reversed, holding that § 2244(b) does not apply to an application that raises only a competency-to-be-executed claim. See Martinez-Villareal v. Stewart, 118 F.3d 628, 634 (9th Cir. 1997), aff'd, 118 S. Ct. 1618 (1998).

In the Supreme Court, the state argued that because Martinez-Villareal already had had one fully litigated habeas petition (in which his Ford claim was found to be premature), § 2244(b) required his new application[11] to be treated as successive. The Court held that the new application, based on the Ford claim, was not a "second or successive" application within the meaning of § 2244(b) because it never had been adjudicated on its merits. See 118 S. Ct. at 1622. In that way,

---

[11]  Both the parties and the Supreme Court treated Martinez-Villareal's motion to "reopen" his Ford claim as a new application for habeas corpus. The term suggests, however, that Martinez-Villareal, at least, viewed the new application as a continuation of, or motion for permission to continue, the previously dismissed application.

33

it said, a claim dismissed as premature is analogous to one
dismissed for failure to exhaust state remedies:

> But none of our cases expounding [the non-exhaustion]
> doctrine have ever suggested that a prisoner whose habeas
> petition was dismissed for failure to exhaust state
> remedies, and who then did exhaust those remedies and
> returned to federal court, was by such action filing a
> successive petition.  A court where such a petition was
> filed could adjudicate these claims under the same standard
> as would govern those made in any other first petition.

Id.  Graham interprets Martinez-Villareal as holding that the new
application was a continuation of the dismissed petition and thus
not successive.  The opinion provides no direct support for this
proposition, however.  Rather, the Court held simply that a
habeas claim that has not been adjudicated on the merits is not
"successive" under AEDPA even if it has been brought before the
courts before and dismissed on procedural grounds.  Both where a
claim is dismissed as premature and for failure to exhaust state
remedies, "the habeas petitioner does not receive an adjudication
of his claim.  To hold otherwise would mean that a dismissal of a
first habeas petition for technical procedural reasons would bar
the prisoner from ever obtaining federal habeas review."  Id.
The Court's conclusion provides no indication that the dismissed
application should be treated as a continuation of the first so
as to preclude the application of AEDPA.  To the contrary, the
Court applied AEDPA in reaching its result.

Graham could fairly point out that in neither Gasery nor
Martinez-Villareal was the dismissed habeas application pending

on the date of AEDPA's enactment. That difference, he would argue, compels the conclusion that AEDPA does not apply in his own case even though it did in Gasery and Martinez-Villareal. See Lindh, 521 U.S. at 323-24, 336 (holding that "the new provisions of chapter 153 generally apply only to cases filed after the Act became effective" and refusing to apply AEDPA to Lindh because his first habeas application was pending in the court of appeals on the date the statute was enacted). To accept that conclusion would create a distinction between applications in an identical procedural posture whose predecessor applications were dismissed only a few days apart. That is, if a prisoner's prior application was dismissed on or before April 23, 1996, AEDPA would govern his "continuation" of this application; if it was dismissed after April 23, 1996, AEDPA would not apply to the "continuation" application. We can see no justification for this disparate result.

As further support for his position that AEDPA does not apply to his current application, Graham argues that federal courts retain an interest in unexhausted habeas suits that they do not in conventional civil suits dismissed without prejudice.[12]

_____

[12] Graham points to the federal courts' "inchoate" interest in dismissed habeas cases in an effort to refute the state's observation that habeas applications are a species of civil action, see Fisher v. Baker, 203 U.S. 174, 181 (1906) (observing that a federal habeas case is "a civil and not a criminal proceeding"), and that civil suits dismissed without prejudice are generally treated as though they had never been filed. For example, in the limitations context, this circuit does not

35

For this reason, he claims, courts often have held or permitted habeas cases to be held in abeyance pending the exhaustion of state remedies, rather than dismissing them outright. As examples, he points to Burris v. Farley, 51 F.3d 655, 659 (7th Cir. 1995); Fetterly v. Paskett, 997 F.2d 1295, 1301-02 (9th Cir. 1993); Scott v. Dugger, 891 F.2d 800, 802 (11th Cir. 1989); Giarratano v. Procunier, 891 F.2d 483, 485 (4th Cir. 1989); Johnson v. Texas, 878 F.2d 904, 906 (5th Cir. 1989); Collins v. Lockhart, 754 F.2d 258, 260 (8th Cir. 1985); and Chenault v. Stynchcombe, 581 F.2d 444, 448 (5th Cir. 1978). Furthermore, Graham insists, we recently made clear in Brewer v. Johnson, 139 F.3d 491, 493 (5th Cir. 1998), that district courts may either hold an unexhausted federal habeas application in abeyance or dismiss it without prejudice, subject to review for abuse of

---

consider a suit filed after a dismissal without prejudice a continuation of the first suit. See Hawkins v. McHugh, 46 F.3d 10, 12 (5th Cir. 1995) ("A federal court that dismisses without prejudice a suit arising from a federal statutory cause of action has not adjudicated the suit on its merits, and leaves the parties in the same legal position as if no suit had been filed."); Lambert v. United States, 44 F.3d 296, 298 (5th Cir. 1995) ("[T]he district court's order dismissing the suit without prejudice left Lambert in the same position as if the first suit had never been filed."). Other circuits have reached the same conclusion. See Chico-Velez v. Roche Prods., Inc., 139 F.3d 56, 59 (1st Cir. 1998); Johnson v. Nyack Hosp., 86 F.3d 8, 11 (2d Cir. 1996); Garfield v. J.C. Nichols Real Estate, 57 F.3d 662, 666 (8th Cir. 1995). The state argues that, consistent with this view, the dismissal of Graham's third federal habeas application without prejudice means, in effect, that it was never filed and was therefore not pending on the date AEDPA became effective for purposes of deciding whether the statute governs Graham's current application.

36

discretion.  If a federal court can hold an unexhausted habeas case in abeyance rather than dismiss it outright, Graham contends, we should view his third habeas application not as never having been filed, but as stayed pending exhaustion.

Graham misunderstands the law governing unexhausted federal habeas applications.  The Supreme Court has held that "a district court must dismiss habeas petitions containing both unexhausted and exhausted claims."  Rose v. Lundy, 455 U.S. 509, 522 (1982).  Subsequent opinions have interpreted Lundy as requiring the dismissal of an application containing any claims that have not been exhausted in the state courts.  See, e.g., Coleman v. Thompson, 501 U.S. 722, 731 (1991) ("This Court has long held that a state prisoner's federal habeas petition should be dismissed if the prisoner has not exhausted available state remedies as to any of his federal claims."); Castille v. Peoples, 489 U.S. 346, 349 (1989) ("Respondent's habeas petition should have been dismissed if state remedies had not been exhausted as to any of the federal claims."); Engle v. Isaac, 456 U.S. 107, 124 n.25 (1982) ("If [an unexhausted due process claim] were present, Rose v. Lundy, 455 U.S. 509 (1982), would mandate dismissal of the entire petition.").  Of course, because exhaustion is based on comity rather than jurisdiction, there is no absolute bar to federal consideration of unexhausted habeas applications.  See Lundy, 455 U.S. at 515; Narvaiz v. Johnson, 134 F.3d 688, 693 n.1 (5th Cir.), cert. denied, 118 S. Ct. 2364

37

(1998); <u>Earhart v. Johnson</u>, 132 F.3d 1062, 1065 (5th Cir.), <u>cert. denied</u>, 119 S. Ct. 344 (1998).  Thus, under certain circumstances, a federal court may consider an unexhausted habeas application.  See <u>Granberry v. Greer</u>, 481 U.S. 129, 134-35 (1987) (concluding that a federal appellate court may consider an application to which the state raises a non-exhaustion defense for the first time on appeal).  Unless the court decides to consider an unexhausted application, however, <u>Lundy</u> dictates that it be dismissed.  Indeed, we recognized this principle in <u>Graham</u>, 94 F.3d at 968, when we noted, citing <u>Lundy</u>, that "[t]he exhaustion doctrine, generally codified in section 2254(b) & (c), requires that normally a state prisoner's <u>entire</u> federal habeas petition must be dismissed unless the prisoner's state remedies have been exhausted as to <u>all</u> claims raised in the federal petition" and dismissed Graham's petition because he "presented significant evidentiary support for his claims of actual innocence and ineffective assistance of counsel that was never presented to the state courts," <u>id.</u> at 969.

Moreover, neither the cases Graham cites nor the current practice of the federal courts support the proposition that abatement of an application containing unexhausted claims is generally an acceptable substitute for dismissal.  We turn first to Graham's own citations.  One of these, <u>Chenault v. Stynchcombe</u>, 581 F.2d 444 (5th Cir. 1978), predates <u>Lundy</u>. <u>Burris</u> and <u>Fetterly</u> held <u>fully exhausted</u> habeas applications in

38

abeyance pending exhaustion of <u>other</u> claims that had not yet been presented to the state courts. See <u>Burris</u>, 51 F.3d at 658-59; <u>Fetterly</u>, 997 F.2d at 1297-98; see also <u>Calderon v. United States Dist. Ct.</u>, 134 F.3d 981, 987 (9th Cir.) (pointing out that <u>Fetterly</u> involved an application containing only exhausted claims), <u>cert. denied</u>, 119 S. Ct. 274 (1998); <u>Greenawalt v. Stewart</u>, 105 F.3d 1268, 1274 (9th Cir.) (same), <u>cert. denied</u>, 117 S. Ct. 794 (1997). It is not clear that the district courts in <u>Scott</u> and <u>Giarratano</u> held in abeyance petitions containing unexhausted claims; at any rate, neither appellant challenged the legitimacy of such an action. See <u>Scott</u>, 891 F.2d at 802; <u>Giarratano</u>, 891 F.2d at 485. <u>Lockhart</u> permitted the abatement of an application containing unexhausted claims, but the Eighth Circuit has since rejected its reasoning in that case. See <u>Victor v. Hopkins</u>, 90 F.3d 276, 280-82 (8th Cir. 1996). Our own court often has dismissed unexhausted habeas applications rather than hold them in abeyance pending dismissal. <u>See, e.g.</u>, <u>Sterling v. Scott</u>, 57 F.3d 451, 454 (5th Cir. 1995) (concluding that the district court was required to dismiss the unexhausted application and, citing <u>Coleman</u>, that it did not err in refusing to hold it in abeyance); <u>McGrew v. Texas Bd. of Pardons & Paroles</u>, 47 F.3d 158, 161 (5th Cir. 1995) ("McGrew's allegations reflect that he has not exhausted his state remedies and, therefore, insofar as his complaint can be construed as seeking

habeas relief, it must be dismissed for failure to exhaust.");[13]

Alexander v. Johnson, 163 F.3d 906, 908 (5th Cir. 1998) ("A habeas petition containing both exhausted and unexhausted claims is a 'mixed' petition which should be dismissed without prejudice."); Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir. 1998) ("A federal habeas petition should be dismissed if state remedies have not been exhausted as to all of the federal court claims."). It is true, as Graham points out, that in Brewer, 139 F.3d at 493 (5th Cir. 1998), we stated, citing Johnson v. Texas, 878 F.2d 904 (5th Cir. 1989), that district courts may either hold an unexhausted petition in abeyance or dismiss it without prejudice. In Brewer, however, the prisoner had been appointed counsel, but had not yet filed a federal habeas application, at the time he sought to have his federal proceeding held in abeyance. See 139 F.3d at 492. Thus, despite its citation to Johnson, the court was not squarely confronted with a situation in which a prisoner seeks to abate an application containing unexhausted claims.

Similarly, several other circuits have concluded that district courts should dismiss without prejudice, and not hold in

---

[13] In the past, we have permitted district courts to abate a prisoner's § 1983 action that we concluded should be treated as a habeas corpus application. See Johnson v. Texas, 878 F.2d 904, 906 (5th Cir. 1989). This practice was an attempt to prevent the § 1983 statute of limitations from barring the prisoner's refiled suit upon his post-exhaustion return to federal court. See Serio v. Members of La. State Bd. of Pardons, 821 F.2d 1112, 1119 (5th Cir. 1987); Jackson v. Torres, 720 F.2d 877, 879 (5th Cir. 1983).

abeyance, habeas applications containing unexhausted claims.  See Calderon v. United States Dist. Ct., 144 F.3d 618, 620 (9th Cir. 1998) (stating that "a petition with exhausted and unexhausted claims must be dismissed or the unexhausted claims stricken from the petition," but permitting amendment of applications to delete unexhausted claims and holding amended petition containing only exhausted claims in abeyance pending exhaustion of deleted claims); Christy v. Horn, 115 F.3d 201, 206-08 (3d Cir. 1997); Victor, 90 F.3d at 280-83; see also Morris v. Bell, 124 F.3d 198, No. 96-5510, 1997 WL 560055, *2-*3 (6th Cir. Sept. 5, 1997) (unpublished table decision) (affirming dismissal of federal habeas application for failure to exhaust even where prisoner argued that district court should have abated proceedings so as to prevent application of AEDPA upon post-exhaustion return to federal court), cert. denied, 118 S. Ct. 1169 (1998).  Thus, there is no general consensus that dismissing a federal habeas application for non-exhaustion is the equivalent of holding it in abeyance pending exhaustion.

Certainly the Texas courts have acknowledged a fundamental difference between the two.  A district court that holds a habeas petition in abeyance but does not dismiss it retains jurisdiction over the case.  See Ex parte Powers, 487 S.W.2d 101, 102 (Tex. Crim. App. 1972).  Therefore, as a matter of comity, the Texas courts will not consider a habeas petition while a federal habeas proceeding concerning the "same matter" or seeking the same

41

relief is presently pending.  See May v. Collins, 948 F.2d 162,

169 (5th Cir. 1991); Carter v. Estelle, 677 F.2d 427, 435-36 (5th

Cir. 1982); Ex parte McNeil, 588 S.W.2d 592, 592-93 (Tex. Crim.

App. 1979); Ex parte Green, 548 S.W.2d 914, 916 (Tex. Crim. App.

1977); Powers, 487 S.W.2d at 102.  Graham suggests that Texas's

habeas abstention doctrine forced the district court to dismiss

his application, that, but for the doctrine, it would have held

the proceeding in abeyance, and that we should therefore act as

though it did so.  But he provides no evidence for his contention

that the lower court would have held his third federal

application in abeyance; indeed, it would not have been justified

in so doing even absent the Texas abstention doctrine.

Furthermore, Texas's refusal to consider a habeas petition

raising the same claims or seeking the same relief as a pending

federal application underscore the fact that dismissal and

abatement are not the same for all purposes.

Indeed, a contrary conclusion would allow a prisoner to

avoid AEDPA (and, inter alia, its statute of limitations) for

many years after the passage of the statute.  We note that, when

Gasery himself returned to the district court after we held that

he was not required to seek permission under § 2244(b)(3)(A) to

file a new application when his initial application was dismissed

for failure to exhaust, the district court found it time-barred

under § 2244(d), even though he filed the first, dismissed

petition before Congress enacted AEDPA.  See Gasery v. Johnson,

42

No. H-97-1685, slip op. (S.D. Tex. Mar. 5, 1998), appeal docketed, No. 98-20221 (5th Cir. Mar. 30, 1998). According to the district court,

> if § 2244(d) were interpreted as Petitioner argues, the result would be impractical. A habeas petitioner could file a non-exhausted application in federal court within the limitations period and suffer a dismissal without prejudice. He could then wait decades to exhaust his state court remedies and could also wait decades after exhausting his state remedies before returning to federal court to "continue" his federal remedy, without running afoul of the statute of limitations.

Id. at 5-6. Construing an application filed after a previous application is dismissed without prejudice as a continuation of the first application for all purposes would eviscerate the AEDPA limitations period and thwart one of AEDPA's principal purposes. See 28 U.S.C. § 2244(d); H.R. CONF. REP. NO. 104-518, at 111 (1996), reprinted in 1996 U.S.C.C.A.N. 944, 944 ("[Title I of AEDPA] incorporates reforms to curb the abuse of the statutory writ of habeas corpus, and to address the acute problems of unnecessary delay and abuse in capital cases. It sets a one year limitation on an application for a habeas writ and revises the procedures for consideration of a writ in federal court."). We decline to do so.

Finally, we must address Graham's argument that this court implicitly held when it dismissed his 1993 application that his current application would not be subject to AEDPA. In his Motion to Recall Mandate in Previous Habeas Appeal, Graham asserts: "The Court's purpose clearly was not to avoid decision of the

43

merits of his claims, to give the new arguments that the merits of Mr. Sankofa's claims should not be decided, or to foreclose review of Mr. Sankofa's claims on the merits." Graham elaborates further in his reply brief:

> [The court] viewed [Graham's] case as a pre-AEDPA case, to which the application of the AEDPA was not a material question. There had been a ruling on the merits of the issues in Mr. Sankofa's case in 1993, and the case had been under submission in this Court since the oral argument in March, 1994. The state did not want further exhaustion. In these circumstances, this Court's decision to defer addressing the merits and to require further exhaustion was based wholly on its view that its eventual decision of the merits would be enhanced by any additional resolution of facts that the state courts might undertake. . . .
>     In these circumstances, it is not only fair, but accurate, to infer that this Court viewed the dismissal for further exhaustion and the eventual return of Mr. Sankofa's case to the federal courts as a continuation of the 1993 habeas proceeding. . . . Now that the further exhaustion ordered by this Court has occurred, and the state courts have again declined to undertake additional factfinding proceedings, and now that Mr. Sankofa has returned to the federal courts with the same allegations and claims he had in 1993, it is time for this Court to declare explicitly what has been implicit--that the refiling of his federal habeas case in 1998 "is merely a continuation of his . . . [1993] collateral attack . . .," In re Gasery, 116 F.3d 1051, 1052 (5th Cir. 1997), for purposes of whether Mr. Sankofa's 1993 case is still pending and, under Lindh, not subject to the AEDPA.

As with Gasery, we think Graham reads too much into this court's 1996 decision in Graham v. Johnson, 94 F.3d 958 (5th Cir. 1996). That opinion declined to accept the state's waiver of exhaustion. See id. at 970-71. Not once did it mention AEDPA or suggest in any way that a post-exhaustion application would be considered under the same standards that prevailed in 1993. While it may be true, as Graham points out, that at approximately the same time,

44

this court applied AEDPA to proceedings pending on the date of the statute's enactment, see Moore v. Johnson, 101 F.3d 1069, 1072-74 (5th Cir. 1996); Drinkard v. Johnson, 97 F.3d 751, 764-66 (5th Cir. 1996), our failure to mention AEDPA in Graham's case cannot be read as implying that it should not apply to him upon his return to federal court.  We had no reason to consider AEDPA's impact on Graham, we made no pronouncements as to our views on that topic, and we certainly did not hold that the statute would not apply to a refiled post-exhaustion application.

### 4. Is AEDPA impermissibly retroactive as applied to Graham's application?

Graham next argues that even if his most recent application is not a continuation of its 1993 predecessor, AEDPA would be impermissibly retroactive as applied to him.  Landgraf v. USI Film Products, 511 U.S. 244 (1994), and Lindh v. Murphy, 521 U.S. 320 (1997), must guide our inquiry.  Under both these cases, we look first to congressional intent in determining the temporal reach of a statute.  In Landgraf, the Court said:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach.  If Congress has done so, of course, there is no need to resort to judicial default rules.  When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.  If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent

45

favoring such a result.

511 U.S. at 280; see Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 837 (1990) ("[W]here the congressional intent is clear, it governs."); cf. Lonchar v. Thomas, 517 U.S. 314, 328 (1996) (criticizing, in a pre-AEDPA regime, the practice of amending a Federal Habeas Corpus Rule "through an ad hoc judicial exception, rather than through congressional legislation or through the formal rulemaking process"). Lindh indicated that despite Landgraf's language about "express" congressional commands, "in determining a statute's temporal reach generally, our normal rules of construction apply." 521 U.S. at 326. Thus, the Court concluded, congressional intent may be implied as well as explicit:

> Although Landgraf's default rule would deny application when a retroactive effect would otherwise result, other construction rules may apply to remove even the possibility of retroactivity (as by rendering the statutory provision wholly inapplicable to a particular case), as Lindh argues the recognition of a negative implication would do here.[14]

Id.

---

[14] Of course, a court will not apply a statute as Congress directs if doing so would violate a constitutional provision, such as the Ex Post Facto Clause or article I, § 10, cl. 1, which prohibits states from passing laws "impairing the Obligation of Contracts." See Landgraf, 511 U.S. at 266-67. But "[t]he Constitution's restrictions . . . are of limited scope," and "[a]bsent a violation of one of those specific provisions, the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope." Id. at 267.

46

When Congress's intent is not clear, however, we employ the default rule against retroactivity, using the analysis laid out in <u>Landgraf</u> to determine whether the statute is genuinely retroactive. Although the Court did not articulate a bright-line test for determining a law's temporal reach in the absence of clear congressional intent, it warned that "[t]he Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration," 511 U.S. at 266, and observed:

> A statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment or upsets expectations based in prior law. Rather, the court must ask whether the new provision <u>attaches new legal consequences to events completed before its enactment</u>. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have "sound . . . instinct[s]," and familiar considerations of <u>fair notice, reasonable reliance, and settled expectations</u> offer sound guidance.

<u>Id.</u> at 269-70 (emphasis added) (citations and footnote omitted). With these principles in mind, we turn to the question we face today.

### a. Congressional Intent

As we observed above, it appears to us that Congress fully intended that AEDPA govern applications such as Graham's. The

47

Second Circuit agrees with us.  See Mancuso v. Herbert, 166 F.3d 97, 101 (2d Cir. 1999) ("We conclude that the AEDPA applies to a habeas petition filed after the AEDPA's effective date, regardless of when the petitioner filed his or her initial habeas petition and regardless of the grounds for dismissal of such earlier petition. . . . [T]his holding comports both with the statute's plain meaning and with congressional intent."). Several circuits, while not explicitly holding that AEDPA applies to an application such as Graham's, have evaluated applications in the same procedural posture with reference to AEDPA.  See Vancleave v. Norris, 150 F.3d 926, 927 (8th Cir. 1998) ("AEDPA's restrictions on successive habeas petitions govern this petition because it was filed two months after the statute's effective date."); Hatch v. Oklahoma, 92 F.3d 1012, 1014 (10th Cir. 1996) ("Because the 1996 Act was already in place at the time of Hatch's filing with this Court, the application of the 1996 Act to his case is not retroactive, and thus does not implicate the Ex Post Facto Clause."); cf. Pratt, 129 F.3d at 58 ("Congress intended that AEDPA apply to all section 2255 petitions filed after its effective date (April 24, 1996)."); In re Vial, 115 F.3d 1192, 1198 n.13 (4th Cir. 1997) (en banc) (assuming without deciding that AEDPA applies to prisoner who filed his first § 2255 motion before and his second motion after AEDPA's effective date).  But see In re Minarik, 166 F.3d 591, 599 (3d Cir. 1999) ("Based on our reading of Landgraf and Lindh, we join

48

two other courts of appeals in holding that AEDPA contains no unambiguous guidance regarding retroactive application of AEDPA's new 'second or successive' petition standards and procedures to cases in which the first habeas petition was filed before AEDPA's enactment."); cf. United States v. Ortiz, 136 F.3d 161, 165 (D.C. Cir. 1998) ("Congress did not expressly indicate whether the AEDPA amendments to the procedures and standards for filing second § 2255 motions are to be applied in cases where the first § 2255 motion was filed before the enactment of AEDPA."); In re Hanserd, 123 F.3d 922, 924 (6th Cir. 1997) (same).  Nevertheless, even if Congress's intent on this score is not clear, § 2244(b) is not impermissibly retroactive as applied to Graham.

### b.  AEDPA's New Procedural Requirements

Under Landgraf, the retroactivity analysis may have to be applied separately to discrete parts of AEDPA.  See 511 U.S. at 280 ("[T]here is no special reason to think that all the diverse provisions of the [Civil Rights Act of 1991] must be treated uniformly for [retroactivity] purposes.").  Therefore, we first consider AEDPA's new procedural requirement that before filing a second or successive application, the prisoner must move in the appropriate court of appeals for an order authorizing the district court to consider the application.  See 28 U.S.C. § 2244(b)(3)(A).  Substituting the court of appeals for the district court as the gatekeeper against abusive or procedurally

49

defaulted claims would seem to raise no retroactivity concerns. A litigant has no reasonable expectation that a particular tribunal will adjudicate his claims.  See Landgraf, 511 U.S. at 274; Vial, 115 F.3d at 1199 (Hall, J., dissenting).  Moreover, § 2244(b)(3)(A)'s requirement that a prisoner desiring to file a second or successive habeas application first approach the court of appeals is a purely procedural change that rarely raises retroactivity concerns.  See Landgraf, 511 U.S. at 275; Minarik, 166 F.3d at 599-600.  Thus, we conclude that the district court did not err in concluding that Graham was required to obtain an order from us authorizing the district court to consider his current habeas application.  See Minarik, 166 F.3d at 599-600; Hanserd, 123 F.3d at 934.

### c.  AEDPA's New Substantive Standards

We now consider whether applying AEDPA's new substantive standards would have an impermissibly retroactive effect in Graham's case.  As a preliminary matter, we note that Graham's situation does not present the typical retroactivity problem because he filed his current application well after AEDPA became law.  Nevertheless, Graham contends that § 2244(b) would unfairly devastate his settled expectations and attach new legal consequences to an event--the filing of an unexhausted federal habeas application in 1993--completed before its enactment.  In his reply brief, he argues that he relied on pre-AEDPA law in

50

deciding in 1993 to proceed to federal court without having

exhausted state remedies:

> Mr. Sankofa "relied to . . . [a significant] extent on
> the . . . [then existing] federal standards of habeas review
> [of successive petitions in] making [his] strategic . . .
> decision[] during the [1993 state and federal
> habeas] . . . litigation," Drinkard, 97 F.3d at 766, to
> forego further exhaustion of state remedies.  In short, he
> "relied to his detriment upon the pre-amendment versions of
> [§ 2244] . . . ."  Hunter, 101 F.3d at 1572.  Had he known
> in 1993 when he made this decision that, because of an
> intervening and wholly unpredictable change in federal law,
> he would not be able to have his constitutional claims heard
> at all in federal court in 1998 if the federal courts
> ordered him to re-exhaust state remedies, indisputably he
> would not have taken the risk in 1993 that he might be
> dismissed from federal court for non-exhaustion.  Clearly,
> "he would have proceeded . . . differently . . . ."
> Drinkard, 97 F.3d at 766, by going through what appeared in
> 1993 to be a futile attempt to obtain relief in state court,
> if for no other reason than to preserve the right to go back
> to federal court after the state courts refused to hear his
> case, which is what eventually happened.

Graham claims to have reasoned that if he was unable to convince

the federal courts that exhaustion was futile and the federal

court therefore dismissed his application, he would simply would

have exhausted his state remedies and, if unsuccessful in state

court, would have returned to federal court under the same law as

governed his dismissed application.  But through no fault of his,

he asserts, resolution of his application was delayed for several

years.  First, the state waived exhaustion; then the Fifth

Circuit waited three years before declining to accept the waiver

and ordering the dismissal of the application.  By this time, a

new Texas statute made it considerably more difficult for

condemned prisoners to obtain a hearing on the merits of a

51

successive habeas application, and AEDPA created similar hurdles in federal court. Thus, Graham argues, applying AEDPA in this case would attach legal consequences to an act completed before its enactment, as it was wholly unforeseeable in 1993 that the filing of an unexhausted application later would subject Graham to AEDPA's strict limitations on successive applications.

In evaluating Graham's argument, we turn first to Supreme Court case law. As we said above, the Landgraf retroactivity analysis focuses on "familiar considerations of fair notice, reasonable reliance, and settled expectations." 511 U.S. at 270. The Court noted, for example, that it often had applied a presumption against statutory retroactivity in cases involving contractual or property rights, "matters in which predictability and stability are of prime importance," id. at 271, and observed further that changes in procedural rules rarely raise retroactivity problems because of "the diminished reliance interests in matters of procedure," id. at 275.

A number of our fellow courts of appeals, following the high Court's guidance, have analyzed this issue in terms of whether AEDPA bars the successive habeas application of a prisoner who relied on pre-AEDPA law in filing a previous application. We find this approach sensible and correct given that retroactivity is disfavored precisely because it upsets settled expectations; if a litigant in no way relies on existing law, then a change in that law cannot fairly be said to harm him. In Burris v. Parke,

52

95 F.3d 465 (7th Cir. 1996) (en banc), the Seventh Circuit considered whether applying AEDPA to a successive application filed after April 24, 1996 where the prisoner had filed a previous application before that date was impermissibly retroactive. The court concluded that AEDPA did not apply to the second petition because the statute, if applied to the refiled application, would attach a new legal consequence, namely that Burris could not file a second application, to a completed event, the filing of the first petition:

> Had Burris foreseen the new law he would in all likelihood have waited, as most prisoners do, until his second sentence was affirmed and then filed a single petition for habeas corpus consolidating his attacks on both the conviction and the sentence. He made a deliberate choice to file two petitions, having no way of knowing (unless gifted with prevision) that the second petition would be subject to a far more stringent test than the test in the existing law, the test of abuse.

Id. at 468 (emphasis added).[15] Later court of appeals opinions distinguish Burris on the ground that the prisoners in their own cases had not shown detrimental reliance on pre-AEDPA law. See In re Magwood, 113 F.3d 1544, 1552 (11th Cir. 1997) ("The present case, however, is distinguishable from Burris because Petitioner has not relied to his detriment upon pre-AEDPA law."); In re

---

[15] Under Lindh, of course, AEDPA would not apply to Burris's second petition because it was pending on the date the statute became law; indeed, the Seventh Circuit decided Burris against the backdrop of its own opinion in Lindh v. Murphy, 96 F.3d 856 (7th Cir. 1996) (en banc), which the Supreme Court later reversed. As we explain infra, however, Lindh does not overrule Burris.

<u>Medina</u>, 109 F.3d 1556, 1563 (11th Cir. 1997) (applying AEDPA to a successive habeas application even though a first application had been filed before April 24, 1996 because the prisoner had not shown detrimental reliance on pre-AEDPA law); <u>Roldan v. United States</u>, 96 F.3d 1013, 1014 (7th Cir. 1996) (holding in § 2255 case that <u>Burris</u> did not apply because prisoner did not "contend that he withheld issues from his first collateral attack in the belief that the doctrine of abuse of the writ permitted such a step").[16]

<u>Lindh</u>, which simply concludes that there was clear congressional intent that AEDPA apply only to habeas cases filed after its enactment, overrules neither the result nor the analysis of <u>Burris</u> and its progeny. Indeed, several post-<u>Lindh</u> courts have reaffirmed the detrimental reliance approach to

---

[16]  Before <u>Lindh</u>, our own court used detrimental reliance analysis to decide whether AEDPA's increased deference to state court factfindings, <u>see</u> 28 U.S.C. § 2254(d), applied to a case pending on appeal on April 24, 1996. <u>See Drinkard</u>, 97 F.3d at 764-66.  In <u>Drinkard</u>, we concluded that AEDPA applied to a prisoner's habeas application because he could not "argue credibly" that he would have proceeded any differently during his state post-conviction proceedings had he known at the time of those proceedings that the federal courts would not review claims adjudicated on the merits in the state court proceedings de novo. The Eleventh Circuit employed a similar mode of analysis.  <u>See Hunter v. United States</u>, 101 F.3d 1565, 1573 (11th Cir. 1996) (discussing application of amended § 2253(c) and Federal Rule of Appellate Procedure 22(b) to pending cases).  Although <u>Lindh</u> overruled <u>Drinkard</u>'s holding, it did not discredit our analysis; rather, it merely concluded that there was clear congressional intent that AEDPA apply only to cases filed after the Act became effective, and that further retroactivity analysis was therefore unnecessary.

54

retroactivity problems where two habeas applications straddle the Act's effective date. In <u>Alexander v. United States</u>, 121 F.3d 312 (7th Cir. 1997), the Seventh Circuit applied AEDPA to a § 2255 motion in the same procedural posture as Graham's current habeas application because the prisoner could not show that he had relied on pre-AEDPA law in litigating his previous § 2255 motions. Anthony Alexander filed his first collateral attack on his criminal conviction before AEDPA became law. <u>See</u> <u>id.</u> at 313. He then filed at least two additional motions after April 24, 1996; despite this, he claimed that AEDPA did not apply to him. <u>See</u> <u>id.</u> at 313-14. The Seventh Circuit noted that "Alexander made that contention in his last application, and we rejected it." <u>Id.</u> at 314. It then quoted from a previous unpublished order:

> Alexander argues that, under <u>Burris v. Parke</u>, 95 F.3d 465 (7th Cir. 1996) (en banc), he need not satisfy the statutory standard, because his first collateral attack predated the AEDPA. This contention was resolved adversely to him when he filed his second collateral attack. We observed then, and reiterate now, that the new law applies because Alexander has not furnished any evidence that, when omitting issues from his first collateral attack, [begun] in 1995, Alexander relied on a plausible belief that the approach then governing--the "abuse of the writ" doctrine detailed in <u>McCleskey v. Zant</u>, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991)--would have permitted a successive collateral attack.

<u>Id.</u> (quoting <u>Alexander v. United States</u>, No. 96-9063 (7th Cir. June 4, 1997) (unpublished order)). Moreover, the First Circuit has concluded that even when a prisoner subjectively relies to his detriment on pre-AEDPA law, he is exempt from the new statute

55

only if his reliance was reasonable.  See Pratt, 129 F.3d at 59

(noting that "reliance upon pre-AEDPA law as a basis for

permitting a second petition rarely will [be objectively

reasonable]" because "[t]he 'cause and prejudice' test that

McCleskey imposed to screen out abusive deployments of the writ

is notoriously difficult to pass" and "Pratt cannot satisfy its

rigors").

The Sixth Circuit is the only court of appeals that has

explicitly rejected a detrimental reliance analysis.  See

Hanserd, 123 F.3d at 931.  In Hanserd, the state argued that

because the prisoner did not "consciously" or "for strategic

reasons" omit an issue from his first habeas application, he

could not be said to have relied on the pre-AEDPA rule and would

have to proceed under AEDPA, if at all.  See id.  The court held

that where AEDPA bars a claim that could have been raised under

pre-AEDPA law, it attaches a new adverse legal consequence to an

event completed before its enactment and is therefore

impermissibly retroactive.  See id.  According to Hanserd, the

detrimental reliance approach is based on an incorrect reading of

Landgraf:

> The central question in [Landgraf] was whether the 1991
> Amendments to Title VII of the Civil Rights Act, which
> provided for compensatory damages in hostile-work-
> environment suits, should be applied to misconduct that
> antedated the new law.  The Court held that it did not
> apply, even though the conduct at issue had been unlawful
> for thirty years before the new law's enactment and could
> previously have supported an award of damages.  The Court

56

> did not speculate as to whether the employer had consciously relied on the old law in allowing discrimination against the plaintiff.

Id. (citations and footnote omitted).  In the same breath, however, the court said: "Instead, the Court held that the new provision should not be applied because doing so would attach a significant new adverse legal consequence to the conduct such that <u>the defendant might have acted differently had he known of that new consequence</u>."  Id. (emphasis added).  Applying this analysis to the case at hand, the court opined that "[u]nder the old law, inmates were supposed to file § 2255 motions promptly. Had Hanserd known that AEDPA would change this, and that his initial § 2255 motion would bar a later motion based on a new Supreme Court interpretation of § 924(c), he might well have waited to file that initial motion."  Id. (citations omitted). But this approach--that a retroactive legal change is one such that a party might have acted differently had he known of it-- amounts to the detrimental reliance rule that <u>Hanserd</u> purports to reject.  The only difference between the standard detrimental reliance approach and <u>Hanserd</u>'s formulation is that the former requires a showing of <u>actual</u> reliance, while <u>Hanserd</u> demands merely that the litigant <u>might have</u> relied on the superseded legal regime.[17]

---

[17]  In addition to the Sixth Circuit, the Third Circuit has held that if a prisoner "can show that he would have been entitled to pursue his second petition under pre-AEDPA law, then the <u>Landgraf</u> default rule prohibits applying AEDPA's new

57

Thus, the Supreme Court, many of the circuit courts, and Graham's own briefs agree that the focus of our retroactivity inquiry should be on the detrimental reliance he placed on pre-AEDPA law and the extent to which the statutory changes upset his settled expectations. Graham cannot show that he might have reasonably relied on pre-AEDPA law in filing any of his federal previous habeas applications.

As a preliminary matter, we note that it is the 1988 application, not the 1993 application, that makes Graham's current application successive and potentially subject to § 2244(b). The relevant time frame for retroactivity analysis is thus 1988, not 1993, because the current application is successive to the one filed in the former year, not the latter. That is, when the cases speak of AEDPA attaching new legal consequences to an application filed before its effective date, they mean that because the prisoner filed that pre-AEDPA

---

substantive gatekeeping provisions to bar his claims." Minarik, 166 F.3d at 602. Similarly, the District of Columbia Circuit has held that "the new standards and procedures under AEDPA for filing § 2255 motions could only be improperly retroactive as applied to [the prisoner] if he would have met the former cause-and-prejudice standard under McCleskey and previously would have been allowed to file a second § 2255 motion, but could not file a second motion under AEDPA." Ortiz, 136 F.3d at 166. Both of these courts concluded that pre-AEDPA law would have barred the prisoner's successive application and did not consider a situation in which pre- and post-AEDPA law would have led to different results but there was no detrimental reliance. A number of other courts, as we noted above in Subsection III.A.4.a, have applied AEDPA to applications in the same procedural posture as Graham's without explicitly considering the retroactivity issue.

58

application, he becomes subject to § 2244(b), which in turn effectively bars a post-AEDPA application.  In Graham's case, AEDPA does not attach new legal consequences in this sense to the 1993 application, but to the 1988 one.  Graham has not alleged detrimental reliance on pre-AEDPA law in 1988, and he cannot even plausibly claim that he might have acted differently had he known that AEDPA later would bar his claims.  Even under pre-AEDPA law, a prisoner was required to present all his claims in his first application, see McCleskey, 499 U.S. at 494-95 (holding that a prisoner wishing to bring a new claim in a second or successive habeas application had to show either that the application did not constitute an "abuse of the writ" or that he had made "a colorable showing of innocence"), and it would not have been reasonable for Graham consciously to hold back claims that he has conceded, see infra Section III.C, he could have included in the 1988 application.  Thus, unlike the prisoner in Hanserd, who filed his § 2255 motion promptly in obedience to the statute in effect at the time, Graham defied pre-AEDPA law by neglecting to include claims and evidence that he could have discovered in 1988 in his first application.  Accordingly, AEDPA is not retroactive with respect to Graham's 1988 application under any detrimental reliance approach.

Graham, however, argues that AEDPA attaches new legal consequences to his 1993 application:  namely, that when he filed it, he thought that he would be able to return to federal court

59

under existing (pre-AEDPA) law, but if the new statute applies,

he cannot.  But AEDPA does not "attach new legal consequences" to

the 1993 application in the sense that his current application is

barred because he filed the unexhausted application.  Rather, the

1993 application has legal consequences only insofar as filing

the unexhausted application delayed the third federal habeas

proceeding so long that state and federal statutes modifying the

scope of habeas relief were enacted during its pendency.[18]  Even

putting aside the argument that such delay may have been Graham's

goal, he had no right to place any reliance on the filing of an

unexhausted application.  Under Keeney v. Tamayo-Reyes, 504 U.S.

1, 5-12 (1992), he was required to present his new evidence to

the state courts before bringing it to federal court.  Although

the state waived the exhaustion requirement, it did so after

Graham decided to file his unexhausted application and could have

played no role in his initial decision to file.[19]  Thus, Graham's

---

[18]  In addition, the 1993 application could have affected
Graham adversely only if, had he exhausted state remedies before
filing his federal application, he would have reached federal
court before the passage of AEDPA.

[19]  Fifth Circuit case law suggested that the federal courts
typically would honor such a waiver.  In McGee v. Estelle, 722
F.2d 1206, 1211 (5th Cir. 1984), we held:

>   If, out of respect, the federal courts defer to the state so
>   that its courts can first pass on claims that the state has
>   denied a person his constitutional rights, it is a corollary
>   that they should defer equally to the state's desire that
>   federal courts not abide a state court ruling.  The
>   supremacy of the federal constitution and the laws made
>   pursuant to it do not convert the fifty states into

reliance argument boils down to this:  He deliberately flouted federal law by filing an unexhausted application, expecting that if it were dismissed without prejudice, he could return to state court and then, perhaps, to federal court under the same law that had been in effect when he filed the unexhausted application.  We find such reliance patently unreasonable.[20]

**5.  Does applying AEDPA to Graham's application constitute an unconstitutional suspension of the writ of habeas corpus and violate the Fifth, Eighth, and Fourteenth Amendments?**

---

dependencies.  Respect should not turn into a fetish for non-precedence with the federal Alphonse endlessly insisting that the state Gaston pass first through the doorway without regard for Gaston's wishes.

The McGee court also asserted, "In the usual case . . . federalism, expense to litigants, and the conservation of judicial resources are all served by honoring the waiver and deciding the merits."  Id. at 1214.  But none of the applicable case law requires a federal court to accept a state's waiver of exhaustion.  Indeed, McGee said:  "A finding of waiver does not conclude our consideration, for a district court or a panel of this court may consider that it should not accept a waiver, express or implied."  Id.  Thus, while Graham may have hoped that the federal courts would accept the state's waiver, it was not reasonable for him to rely on such an acceptance.

[20] The state urged both in its briefs and in oral argument that we should deny Graham's Motion for Order Authorizing District Court to Consider Successive Habeas Petition because his current application is time-barred under 28 U.S.C. § 2244(d).  We need not reach the limitations question, however, because Graham concedes, see infra Section III.C, that he cannot meet the requirements for the issuance of such an order.  We express no opinion as to whether a court of appeals should consider the timeliness of a habeas application in deciding a prisoner's motion for authorization to file it.

61

Finally, Graham presents a sketchy argument that AEDPA cuts off federal court review of a constitutional violation that resulted in a conviction and death sentence for a factually innocent person and, as such, constitutes an unconstitutional suspension of the writ of habeas corpus and a violation of the Fifth, Eighth, and Fourteenth Amendments.

We accept Graham's concession that AEDPA would preclude his application, see infra, but we do not agree that the statute is therefore unconstitutional.  The Supreme Court has rejected the argument that AEDPA's new restrictions on successive habeas petitions are a "suspension" of the writ of habeas corpus contrary to article I, § 9, clause 2 of the federal Constitution. See Felker, 518 U.S. at 663-64.

Nor do AEDPA's amendments to § 2244(b) violate the Fifth, Eighth, and Fourteenth Amendments.  We have found no support for Graham's argument that denying federal court review of a successive habeas application alleging that constitutional violations resulted in the conviction of an innocent person contravenes due process and constitutes cruel and unusual punishment.  The Supreme Court has stated that a procedural limitation "is not subject to proscription under the Due Process Clause unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  Medina v. California, 505 U.S. 437, 445 (1992) (quoting Patterson v. New York, 432 U.S. 197, 201-02 (1977))

62

(citations and internal quotation marks omitted). As <u>Felker</u> pointed out, the first Congress made the writ of habeas corpus available only to federal, not state, prisoners. <u>See</u> 518 U.S. at 663. Thus, the Framers could not have viewed the availability of habeas relief to inmates such as Graham as "so rooted in the traditions and conscience of our people as to be ranked as fundamental." Even assuming, as <u>Felker</u> did, <u>see</u> <u>id.</u> at 663-64, that state prisoners' right to petition federal courts for writs of habeas corpus has become such a fundamental prerogative over the years, AEDPA's restrictions on successive applications fall within Congress and the courts' traditional power to limit abuses of the writ. "[T]he doctrine of abuse of the writ refers to a complex and evolving body of equitable principles informed and controlled by historical usage, statutory developments, and judicial decisions. The added restrictions which the Act places on second habeas petitions are well within the compass of this evolutionary process . . . ." <u>See</u> <u>id.</u> at 664 (citations and internal quotation marks omitted). As such, we do not see how the pre-AEDPA abuse-of-the-writ standards can be fundamental to our notions of due process. Similarly, a punishment is not cruel and unusual so as to violate the Eighth Amendment unless it is inhuman and barbarous, <u>see</u> <u>In re Kemmler</u>, 136 U.S. 436, 447 (1890), or, in a more modern formulation, "shocks the conscience and sense of justice of the people," <u>Furman v. Georgia</u>, 408 U.S. 238, 360 (1972) (Marshall, J., concurring). Given that AEDPA's

63

successive application rules are, in the words of the Supreme Court, "well within" the traditional authority of Congress and the courts to curb abuses of the writ, we do not see how they can "shock the conscience."

Finally, assuming for the purpose of argument only that Graham is actually innocent, this court has rejected a claim such as that made by Graham that the execution of an innocent person, even where no constitutional violation has taken place, contravenes the Fifth, Eighth, and Fourteenth Amendments. While the Supreme Court assumed arguendo that in a capital case a "truly persuasive" demonstration of actual innocence made after trial would render the execution of a defendant unconstitutional and warrant federal habeas relief if there were no state avenue open to process such a claim, Herrera, 506 U.S. at 417, we have rejected that theory, see Lucas v. Johnson, 132 F.3d 1069, 1074–76 (5th Cir.), cert. dism'd, 1998 WL 313489 (1998). Moreover, there is a state avenue open to Graham: He retains his right to petition the Texas Board of Pardons and Paroles for clemency.

In summary, we find that AEDPA, as construed by the Court in Lindh, applies by its terms to Graham's fourth federal habeas application. We reject Graham's contention that this application is a continuation of the application dismissed in 1996 for failure to exhaust state remedies for purposes of determining whether AEDPA applies. If we are wrong in concluding that Congress clearly evinced an intent that AEDPA should govern

64

applications such as Graham's, we nevertheless find that the statute is not impermissibly retroactive as applied to Graham's fourth application. Finally, we hold that applying AEDPA to Graham's current application does not violate the Constitution. In this case, Congress has spoken, and we are compelled to listen.

**B. Motion to Recall Mandate in Previous Habeas Case**

As an alternative to finding that § 2244(b) does not apply to his application, Graham urges us to recall the mandate in his third federal habeas proceeding, Graham v. Johnson, 94 F.3d 958 (5th Cir. 1996), ordering the district court to dismiss the application in that case for failure to exhaust state remedies. Citing Thompson, 118 S. Ct. at 1498, he asserts that the courts of appeals have an inherent power, to be used as a last resort against "grave, unforeseen contingencies," id., to recall their mandates and that they may revisit the merits of an earlier decision denying habeas corpus relief to a state prisoner if they act to "avoid a miscarriage of justice as defined by our habeas corpus jurisprudence," id. at 1502. A prisoner meets this standard, Graham says, if he demonstrates that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence presented in his habeas petition." Id. at 1503. Applying these principles to his own case, Graham contends that the 1996 dismissal without prejudice was not meant

to cause harm to his legal rights and interests and that the court's intentions were thwarted by a grave, unforeseen contingency--namely, the passage of the 1995 Texas habeas statute and AEDPA. Because he can show that recalling the 1996 mandate would avert a miscarriage of justice, he argues, he is entitled to such relief. But Thompson held that if a court of appeals recalls a pre-AEDPA mandate as a result of a post-AEDPA motion, AEDPA applies to the motion, although this is not true if the court recalls its mandate of its own accord. See id. at 1499-1500. Our consideration of Graham's argument is, quite obviously, not a sua sponte decision but a response to his request that we do so. AEDPA therefore applies to Graham's Motion to Recall Mandate in Previous Habeas Case; because he concedes, see infra, that he cannot meet AEDPA's substantive requirements, we must deny that motion.

## C. Motion for Order Authorizing District Court to Consider Successive Habeas Petition

Under AEDPA, a court of appeals may authorize a district court to consider a second or successive habeas application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of § 2244(b). See 28 U.S.C. § 2244(b)(3)(C). Graham concedes that he cannot make any such showing, either with respect to the claims he brought in his earlier application or those never before presented. He admits that § 2244(b)(1)'s absolute bar against

re-raising "in a second or successive habeas corpus application under section 2254" a claim "that was presented in a prior application" precludes the alibi defense aspect of his ineffective assistance and actual innocence claims, which he raised in his first federal habeas proceeding in 1988. Graham also acknowledges that AEDPA bars his previously unpresented claims. According to his Motion for Order Authorizing District Court to Consider Successive Habeas Corpus Petition, his current application "relies on his actual innocence, not on 'a new rule of constitutional law,' to satisfy the criteria of § 2244(b)." Thus, under § 2244(b)(2)(B), he must show that (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty of the underlying offense. These requirements, Graham admits, foreclose

his application.[21]  In his Motion for Order Authorizing District

Court to Consider Successive Habeas Petition, he states:

> The AEDPA's addition of another requirement, in addition to the actual innocence requirement, for the presentation of a previously-unpresented claim in a successive habeas petition--"the factual predicate for the claim could not have been discovered previously through the exercise of due diligence," 28 U.S.C. §§ [sic] 2244(b)(2)(B)(i)--has a preclusive effect in Mr. Sankofa's case.  The information that allowed Mr. Sankofa to present his multi-faceted claims of ineffective assistance and innocence in 1993 was the offense report in the district attorney's file, Appendix 17 to the 1998 federal habeas petition.  This report was obtained through a state open records act request that could as readily have been made in connection with the first habeas proceeding in 1988 as it was in connection with second habeas proceeding in 1993.  Thus, Mr. Sankofa will not be able to show that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence," 28 U.S.C. §§ [sic] 2244(b)(2)(B)(i).  Under the law that applied to Mr. Sankofa's petition in 1993, he is entitled to have his ineffective assistance and actual innocence claims considered on the merits.  Under the AEDPA, he will not be.

Graham's habeas counsel also conceded at oral argument:  "We

acknowledge that we cannot show that these claims could not have

been raised in 1988."  The following colloquy with the court

ensued:

---

[21]  Graham's briefs do not explicitly address whether the third claim in his current habeas application--namely, that he was unconstitutionally tried as an adult and that the Texas death penalty statute does not permit adequate consideration of youth as a mitigating factor--meets § 2244(b)'s requirements.  The former claim apparently has not been raised before and is governed by § 2244(b)(2).  Graham does not contend that it is based on a new rule of constitutional law or that he could not have discovered the factual basis for it in 1988, when he filed his first federal habeas application.  The latter claim was thoroughly litigated in his first federal habeas proceeding, see supra Part I, and is barred under § 2244(b)(1).

68

THE COURT: So your view is, then, that if the AEDPA applies to this petition, then you don't have a case.

COUNSEL: If the AEDPA applies in every way that it is written, that's right.  We are precluded.  And there is-- there is--

THE COURT: This is really, in a basic sense, a one-issue case.  I mean, you have all of this, uh, evidence that you've brought forward, but it all comes down to the question of, a legal question, which is, does the AEDPA apply to the habeas petition that's pending in front of us?

COUNSEL: That's exactly right.

THE COURT:  If it does, you don't have a case; if it doesn't, then you think that you do.

COUNSEL:  I mean, we certainly think we have at least the case that we had in 1993.

AEDPA does apply to Graham's application.  He concedes that he cannot meet its requirements for filing a second or successive habeas application.  Under these circumstances, we are compelled to deny his motion for an order authorizing the district court to consider such an application.

### IV.   CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court and DENY Graham's Motion to Recall the Mandate in Previous Habeas Case.  As stated in our order of February 8, 1999, Graham's Motion for Order Authorizing District Court to Consider Successive Habeas Petition is likewise DENIED.